UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| DAVID FARR, | ) | |
|         Plaintiff, | ) | |
| | ) | |
|     vs. | ) | 1:06-cv-779-SEB-JMS |
| | ) | |
| ST. FRANCIS HOSPITAL & HEALTH | ) | |
| CENTERS, | ) | |
|         Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause is before the Court on Defendant's Motion for Summary Judgment [Docket No. 60], filed on October 26, 2007, pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1.  Plaintiff, David Farr, brings his claim against his former employer, Defendant, St. Francis Hospital and Health Centers ("St. Francis"), for its allegedly discriminatory actions toward him based on his gender,[1] in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*  For the reasons detailed in this entry, we <u>GRANT</u> Defendant's Motion for Summary Judgment.[2]

---

[1] In his Amended Complaint, filed on January 19, 2007, in addition to his gender discrimination claim, Farr alleged a breach of an implied covenant of fair dealing, negligence, defamation, and wrongful discharge.  However, we dismissed all counts, except the gender discrimination claim, in our prior entry, filed September 26, 2007 [Docket No. 55].

[2] Defendant, St. Francis, also filed a Motion to Exclude Plaintiff's Expert Testimony [Docket No. 67], on December 17, 2007.  Because we grant St. Francis's motion for summary judgment, regardless of Farr's expert testimony, we <u>DENY AS MOOT</u> its Motion to Exclude Plaintiff's Expert Testimony.

**Factual Background**

In 2000, David Farr was hired as a therapist in the respiratory care department of St. Francis Hospital.  Little Dep. at 8-10; Farr Dep. at 28, 30, 90.  In 2004, Farr transferred to a respiratory therapist position in the pulmonary rehabilitation (hereinafter, "rehab") department of St. Francis.  Little Dep. at 8-10; Farr Dep., p. 29.  During Farr's employment in the respiratory care department, he was supervised by Connie Little, the department head.  Farr Dep. at 30; Sagar Dep. at 33.  However, upon his transfer into the pulmonary rehab department, Beverly Smith became Farr's immediate supervisor.  Farr Dep. at 31; Sagar Dep. at 33.  According to Farr's assessment, both Ms. Smith and Ms. Little were "fair" supervisors.  Farr Dep. at 34.  At the time of his termination, there were approximately seven respiratory therapists, including Farr, in the pulmonary rehab department.  Farr Dep. at 37; Smith Dep. at 6; Little Dep. at 21-22.  Of these seven respiratory therapists, Farr was the only male.  Smith Dep. at 27.

Each of the pulmonary rehab respiratory therapists is expected to use a single computer located in the center of the pulmonary rehab office.  Little Dep. at 18, 22; Farr Dep. at 40.  Each therapist has his/her own private user name and password, making it possible for the hospital to trace computer usage to individual users.  Little Dep. at 18, 22, 25; Farr Dep. at 40-41.  Employees are instructed to log on to the computer when they begin using it and to log off the computer when they are finished.  Little Dep. at 25-28.  However, according to Farr, "[t]ypically one person would log on in the morning, usually the first person to get into the department, and that person would stay logged on

2

throughout the day. There were some people who . . . would log off and force somebody

to log back on again." Farr Dep. at 152.  Despite Farr's assertion that therapists generally

did not adhere to these hospital rules, Farr nonetheless admits that he was aware of St.

Francis's policy instructing employees to log off, such that he maintained responsibility

for his own computer password and ID.  Farr Dep. at 161-62; Sagar Dep. at 26; Smithers

Dep., Vol. I. at 59-60.

The therapists in Farr's department used the computer primarily for creating

medical reports and for writing letters to physicians.  Farr Dep. at 38; Smith Dep. at 7;

Little Dep. at 32-34.  Occasionally, the therapists also used the computer for internet

research regarding medical devices.  Farr Dep. at 38-39.  Therapists were permitted to use

the computer for personal reasons as long as said use was infrequent and appropriate.

Farr Dep. at 158; Smith Dep. at 8; Little Dep., at 35-36; Smithers Dep., Vol. I at 76-77.

*Events Leading to Plaintiff's Termination*

On April 21, 2005, Sally Mattingly, another respiratory therapist in the

department, approached Beverly Smith, Farr's supervisor at the time, with a request that

she look at the computer in the pulmonary rehab office.  Smith Dep. at 17; Little Dep. at

37-39.  Ms. Mattingly and Ms. Smith entered the empty respiratory therapy room and Ms.

Smith moved to investigate the computer, whereupon she observed that, when she clicked

on the "favorites" button, several "lurid" and "obscene" website names appeared.  Smith

Dep. at 18-22; Plaintiff's Ex. 15 at 3.  When Ms. Smith viewed the login screen, she

3

determined that Farr was logged onto the computer as its user.  Smith Dep. at 22.  Ms. Smith immediately deleted the names of the offensive websites and logged Farr off the computer.  Smith Dep. at 22.  Shortly thereafter, Ms. Smith reported to her supervisor, Ms. Little, that she had discovered evidence of illicit computer activity under Farr's login on the pulmonary rehab computer and that she had deleted the sites from the favorites list.  Smith Dep. at 27-29; Little Dep. at 40-41, 44, 46.  As mentioned above, Ms. Little is the Director of Respiratory Care Services and Ms. Smith's immediate supervisor.  Smith Dep. at 3; Little Dep. at 4; Sagar Dep. at 32.

Both Ms. Smith and Ms. Little believed that Farr had logged onto the computer earlier that day and had then walked away from the station without logging off, which allowed Ms. Mattingly to discover the obscene material.  Smith Dep. at 23; Little Dep. at 41.  Ms. Little contacted her supervisor, Susan Brown, who suggested that Little notify Human Resources.  Little Dep. at 45.  Human Resources, in turn, advised Ms. Little to inform Information Technology ("IT")[3] and to confront Farr, both of which actions Ms. Little took.  Little Dep. at 45-46.  Farr was asked to meet with Ms. Little and Ms. Smith in Ms. Little's office and, there, he was told that "inappropriate" websites had been found on the computer used by the pulmonary rehab respiratory therapists.  Farr Dep. at 34-36; Little Dep. at 46; Smith Dep. at 29.  At that time, Farr assumed that the inappropriate computer use about which he was being questioned related to adult content or

---

[3] At St. Francis, Information Technology is also referred to as Information Services or Alverno.  Smith Dep. at 32.

pornography, but he denied having any knowledge as to how the material appeared under his login on the computer. Farr Dep. at 42-43, 49, 78, 110-11, 121-22; Smith Dep. at 30; Little Dep. at 47.

Ms. Little informed Farr that the hospital would conduct an investigation and be back in touch with him thereafter.  Farr Dep. at 43; Smith Dep. at 31; Little Dep. at 48. She also informed the hospital's IT department that it appeared one of her employees had been accessing illicit websites from the hospital's computer and requested that IT investigate the questionable computer activity.  Little Dep. at 45.  The following day, IT removed the computer from the pulmonary rehab office.  Smith Dep. at 32-33; Little Dep. at 46, 50-51; Sagar Dep., Vol. I at 29-30.

On June 6, 2005, Farr took an approved medical leave of absence for reasons unrelated to this matter.  Farr Dep. at 43-44; Little Dep. at 52.  By that time, IT had not yet completed its analysis of the computer and Farr had had no further conversations with either Ms. Little or Ms. Smith.  Farr Dep. at 43-44; Little Dep. at 52.  The day after Farr was on medical leave, Karen Sagar, St. Francis's Director of Recruitment and Retention (human resources), telephoned Ms. Little and Ms. Smith and told them that IT had produced a report summarizing its investigation.  Little Dep. at 53-54; Smith Dep. at 39; Sagar Dep. at 3.  Ms. Sagar had been informed by Karen Smithers, the Director of IT's human resources and the liaison between IT and St. Francis, that the IT analyst had completed his review and found that inappropriate sites had been accessed on the day in

question.[4]  Sagar Dep. at 7-10; Plaintiff's Ex. 19; Smithers Dep. Vol. I at 3, 17-18, 35-36.

A few days earlier, on June 3, 2005, Ms. Sagar had received and submitted to Ms. Little a written report from Ms. Smithers summarizing IT's findings.  Sagar Dep. at 10-13, 16; Smithers Dep., Vol. I at 44-49; Pl.'s Ex. 19, at 0412-0423.  Additionally, Ms. Sagar and Ms. Smithers spoke regarding said findings.  Smithers Dep., Vol. I at 38-39.  Ms. Smithers assessed the information that she received from Ms. Sagar during a prior conversation she had about the report with Scott Allen, the security analyst who performed the review.  Smithers Dep., Vol. 1 at 66-69.  Ms. Smithers explained that an individual using user ID number ACDS741 had accessed several pornography sites; moreover, IT had tied the login specifically to David Farr.  Smithers Dep., Vol. I at 38-39.  Additionally, Ms. Smithers indicated, "There were a few pornographic sites that had been downloaded, but that there were a significant number of what our security analyst termed hacking type of sites. And that those were of greater concern to us than the pornographic material that was . . . downloaded on that PC."  Smithers Dep., Vol. I at 39, 84.

Next, Ms. Little met with Ms. Smith and Ms. Sagar in Ms. Sagar's office to review and discuss the IT department's investigative report.  Smith Dep. at 39-40; Little Dep. at 54; Sagar Dep. at 13-14.  Sagar informed Smith and Little that the report linked a list of pornographic websites, as well as "hacking" and "spyware" websites, to Farr's login ID number.  Smith Dep. at 41-42; Little Dep. at 54-58, 86-89.  Ms. Sagar explained to Ms.

---

[4] Ms. Smithers does not advise St. Francis on disciplinary issues; she merely reports the results of IT investigations.  Smithers Dep., Vol. I, at 78-79.

Little that she was "very surprised and certainly more upset" with the spyware and hacking sites, primarily because IT reported that it was not amateur work and that it was "very planned." Little Dep. at 88. Based on the computer review, Ms. Sagar and Ms. Little determined that the hospital's computer had been used inappropriately by Farr's accessing of pornographic and hacking websites. Sagar Dep. at 14-15, 20-21.

As a precautionary measure, Ms. Little decided to continue the investigation to determine if there was evidence that any other employees in the department had accessed inappropriate websites on the computer. Little Dep. at 59; Smith Dep. at 42-43, 46-47. To that end, Ms. Little provided IT with the usernames of all of the other employees who worked in the pulmonary rehab department, but IT's investigation revealed no evidence that any other employee had been accessing inappropriate websites. Little Dep., at 61-62; Smith Dep. at 46-48. As an additional precaution, Ms. Little asked Ms. Smith to examine work schedules, job assignments, and time records in order to ascertain whether there was any correlation between work activity and the inappropriate computer usage referenced in the IT investigation report. Smith Dep. at 42-44; Little Dep. at 77-78. On the basis of this investigation, Ms. Smith confirmed that, on Saturday, April 16, 2005, when (per IS's determination) a substantial amount of computer activity involving pornography and hacking occurred, Farr was the only employee working in the pulmonary rehab area. Smith Dep. at 43-44; Little Dep. at 86-87. Ultimately, Ms. Little declared that the investigation was thorough enough to rule out the possibility that anyone other than Farr had accessed the inappropriate websites. Little Dep. at 62. Therefore, Ms. Little and Ms.

Sagar decided to terminate Farr's employment at the hospital.[5]

Since Farr was on a medical leave of absence at the time Ms. Little decided to terminate him, Ms. Little decided to refrain from informing him of his termination until his return to the hospital. Little Dep. at 62-63. On or about July 21, 2005, Farr contacted Ms. Smith to tell her that he had been released from his medical leave and encouraged to return to work. Smith Dep. at 48; Little Dep. at 64. At that time, Ms. Smith asked Farr to report to Human Resources the following Monday, July 25, 2005. Smith Dep. at 50; Little Dep. at 64-65. On July 25, 2005, Farr met with Ms. Little and Ms. Sagar in Ms. Sagar's office, whereupon Farr was informed that the investigation uncovered evidence that Farr had inappropriately used the pulmonary rehab department computer. Little Dep. at 45-46, 64-6; Sagar Dep. at 18-9. Farr denied visiting those sites and could not explain why they were found under his login name. Farr Dep. at 46-47; Little Dep. at 66-67; Sagar Dep. at 20.

Although the decision to terminate Farr's employment had already been made at the time of the meeting, Farr's denial of having accessed the pornography websites prompted Ms. Little to request that IT conduct a further investigation that might explain why said websites appeared to have been accessed from Farr's login. Little Dep. at 65-67; Sagar Dep. at 17-18, 21. Pending the outcome of the investigation, Farr was placed on a five-day suspension from the hospital. Little Dep. at 67; Farr Dep. at 46-47. Ms.

_____

[5] Although Ms. Little consulted with Ms. Sagar about Farr's potential termination, the decision was ultimately Ms. Little's. Sagar Dep. at 24

Little instructed Farr that she would meet with him on July 29 to inform him of the final results of the investigation.  Farr Dep. at 50, 64; Sagar Dep. at 21.  After the meeting with Farr, Ms. Sagar contacted Ms. Smithers and asked her to ascertain whether any further information could be uncovered with respect to the websites that had been accessed. Sagar Dep. at 22 31-37; Plaintiff's Ex. 24 at 0503.  As a result, three additional computers in the pulmonary rehab area underwent a firewall search to determine whether other individuals had engaged in inappropriate activity.  No additional inappropriate usage was found. Smithers Dep., Vol. I at 40-43, 71; Plaintiff's Ex. 19.

On July 29, 2005, Farr returned to St. Francis to meet with Ms. Little, accompanied by two attorneys, whom Ms. Little was not expecting.  Farr Dep. at 50-51. Taken aback by the presence of attorneys, Ms. Little referred them to St. Francis's legal department and declined to further comment.  Farr Dep. at 50-51.  On August 5, 2005, Ms. Smith generated Farr's termination letter, which both Ms. Little and Ms. Smith signed.  Smith Dep. at 52-54; Little Dep. at 92-93; Pl.'s Ex. 17.  Farr received the termination letter shortly thereafter.[6]  Farr Dep. at 61-62.  Farr was ultimately terminated for "breach of good conduct and inappropriate usage of the Hospital's electronic communications systems." Pl.'s Ex. 17. This was the only reason for his termination that St. Francis provided to Farr.  Farr Dep., pp. 120-21.  According to Ms. Little's testimony, although the discovery of the pornography sites prompted further investigation, his

---

[6] Farr does not recall the precise date that he received his termination letter.

termination was ultimately contingent on his association with the (more problematic)

hacking sites.  Little Dep. at 88-91.

*Post Termination Events*

Pursuant to hospital policy, following his termination, on August 31, 2005, Farr

filed a grievance with the hospital.[7]  Farr Dep. at 55-57, 63; Def.'s Ex. B.  In accordance

with the grievance procedure, Ms. Smith prepared a short synopsis outlining the reasons

for Farr's termination.  Smith Dep. at 56-57; Pl.'s Ex. 18 at 2.  Additionally, through his

attorneys, Farr hired a computer expert, Markus Jakobsson, to provide a report to the

grievance committee supporting Farr's innocence.  Farr Dep. at 58.  According to Farr, he

corresponded with Jakobsson only through e-mail and never met or otherwise conversed

with him.  Farr Dep. at 73, 126.  As revealed in discovery, in one of Farr's e-mails to

Jakobsson, Farr provided a comprehensive analysis of the websites that he remembered

visiting on the pulmonary rehab computer.  Farr Dep. at 68-70, 75; Def.'s Ex. D; Def.'s

Ex. E.  In his analysis, Farr did not provide Jakobsson with any information regarding any

of the security systems or firewall protections that were in place on St. Francis's

computer security systems during his employment there.  Farr Dep. at 130-31.      Farr

has since admitted that he visited at least 17 of the 31 websites that were of concern to St.

Francis.  Farr Dep. at 78-87, 111-12; Def.'s Ex. E.  According to Farr, he had visited said

---

[7] Farr's grievance did not include an allegation that his termination was based on his sex. Def.'s Ex. B; Farr Dep. at 136-37.

websites because his home computer had crashed and he was using St. Francis's computer to "try[] to find some way to get this software installed on [his] computer at home without having to go out and purchase another copy of Windows."[8]  Farr Dep. at 76-77.  Farr requested assistance from Jakobsson regarding the manner in which he should provide his analysis because he did not want to say anything "which may cause problems later on."  Farr Dep. at 72; Def.'s Ex. D, p. 2.  Jakobsson, in turn, suggested that Farr "de-emphasize that [Farr] went to the site cracklocator.net," whereupon Farr altered his analysis accordingly.  Farr Dep. at 74, 81-83; Def.'s Ex. D, E at 4.

At the request of St. Francis's in-house legal counsel, IT created a rebuttal report to Jakobsson's report on Farr's computer use.  Farr Dep. at 145-46; Def.'s Ex. J; Smithers Dep., Vol. I at 19-20, 51.  Farr's perception regarding the rebuttal was that it was intended to "cover [St. Francis's] mistake for not having the . . . firewall up to date," rather than to evade a potential sex discrimination claim.  Farr Dep. at 157.  In his deposition, Farr testified that he generally agreed with the report, and disputed only minor facts in one paragraph, which he did not feel were written maliciously or in bad faith. Farr Dep. at 146-49.  A final draft of IT's report and the report from Jakobsson were each submitted to St. Francis's legal department and, ultimately, to the grievance committee. Sagar Dep. at 68-69; Smithers Dep., Vol. II at 7, 27; Def.'s Ex. J; Pl.'s Ex. 30.  Upon

---

[8] Farr's explanation surfaced only during discovery, however, as he did not offer it during his initial questioning about the inappropriate computer use.  Farr Dep. at 77-78.  At the time of investigation, Farr assumed that the inappropriate computer use for which he was being questioned related only to adult content or pornography, about which he professed to know nothing.  Farr Dep. at 49, 78, 110-11, 121-22.

review, the grievance committee unanimously upheld Farr's termination.  Farr Dep. at 59;

Sagar Dep. at 70-71.


*The Instant Litigation*

On November 2, 2005, Farr filed a charge of discrimination with the Equal

Employment Opportunity Commission ("EEOC").  Farr Dep., pp. 107-09; Def.'s Ex. H.

In his charge, Farr asserted that the inappropriate websites had been uploaded to his

computer by a virus, but that his supervisors at St. Francis assumed him guilty of looking

at pornography, merely because he was the only male in the pulmonary rehab respiratory

therapy department.  Farr Dep. at 113-14, 133-35, 138-39.  Nevertheless, Farr also asserts

that he has no knowledge of any other employee at St. Francis who has been accused of,

but not terminated for, for accessing inappropriate websites.  Farr Dep. at 141.


## Legal Analysis

### I.    Standard of Review

Summary judgment is appropriate when the record shows that there is "no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter

of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

Disputes concerning material facts are genuine where the evidence is such that a

reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party.  See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment.  Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323. The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case.  Id. at 325.

Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes.  Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994).  Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate.  See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989).  But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary

13

judgment is not only appropriate, but mandated.  See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003).   Further, a failure to prove one essential element "necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 323.

A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment.  Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available.  Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996).  To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination.  However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts.  Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

## II.      Discussion

Under Title VII, it is unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's sex."  42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove discrimination under Title VII either with direct evidence of discrimination or indirectly through the burden-shifting analysis established in McDonnell Douglas v. Green, 411 U.S. 792 (1973). Scaife v. Cook County, 446 F.3d 735, 739 (7th Cir. 2006).  The parties here have addressed both the direct and indirect methods in their submissions, so we follow their lead and discuss both avenues of proof.

### A.   Direct Method

Typically, the direct method of proof is used when there is an admission of discriminatory animus by the employer.  Phelan v. Cook County, 463 F.3d 773, 779 (7th Cir. 2006).  It is undisputed that there has been no such admission by St. Francis here. However, the Seventh Circuit recognizes that "[a] plaintiff can also prevail under the direct method of proof by constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker."  Rhodes v. Illinois Dep't of Transp., 359 F.3d 498, 504 (7th Cir. 2004).  To defeat summary judgment using this method, "[a]ll that is required is evidence from which a rational trier of fact could reasonably infer that the defendant had fired the plaintiff because the latter was a member of a protected class."  Phelan, 463 F.3d at 780 (quoting Troupe v. May

15

Dep't Stores Co., 20 F.3d 734, 736 (7th Cir. 1994)). "That circumstantial evidence, however, 'must point directly to a discriminatory reason for the employer's action.'" Cerutti v. BASF Corp., 349 F.3d 1055, 1061 (7th Cir. 2003) (quoting Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003)).

The Seventh Circuit has identified three means by which a plaintiff can survive summary judgment using circumstantial evidence under the direct method.  These means are as follows:

> The first [and most common] consists of suspicious timing, ambiguous statements oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn. . . . Second is evidence, whether or not rigorously statistical, that employees similarly situated to the plaintiff other than in the characteristic (pregnancy, sex, race, or whatever) on which an employer is forbidden to base a difference in treatment received systematically better treatment.  And third is evidence that the plaintiff was qualified for the job in question but passed over in favor of (or replaced by) a person not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimination.

Hossack v. Floor Covering Associates of Joliet, Inc., 492 F.3d 853, 862 (7th Cir. 2007) (quoting Troupe, 20 F.3d at 736).

Although it is not completely clear from Farr's brief which type of circumstantial evidence he claims to be presenting, it appears that he contends that he has produced sufficient evidence to establish a question of material fact under the second method described in Hossack – that is, comparative evidence.  As mentioned above, in the Seventh Circuit, to defeat summary judgment with circumstantial comparative evidence, a

plaintiff must demonstrate that similarly situated, non-protected employees received "systematically better treatment."  See Troupe, 20 F.3d at 736.  Farr has failed to make such a showing.

Farr contends that he received worse treatment than his similarly situated female co-workers because, upon discovering the pornographic hyperlinks under his user ID and password, his supervisors immediately concluded that he was at fault without investigating or questioning any of the other three female therapists working that day, despite the knowledge that all the therapists used the computer equally and it was supposedly common for the therapists to use each other's login information.  The facts in the record, however, belie Farr's contention.  Initially, it is clear that Farr's supervisors did not immediately make a definitive determination that Farr was the one responsible for the pornographic hyperlinks.  In fact, Ms. Little, one of Farr's supervisors, testified that she told Ms. Mattingly, who had reported the illicit computer use, that the information regarding the pornographic hyperlinks had to be kept confidential in order to *protect* Farr, because "we don't know what really happened.  And if something has happened that it really wasn't Dave, then it is important that he gets the benefit of the doubt."  Little Dep. 40-41.  In line with this sentiment, Ms. Little referred the matter to the IT department for further investigation, informing IT only that she had a computer on which illicit sites had been found under one of her employee's ID's.

Following its investigation, the IT department reported that not only had multiple pornographic sites been accessed on various occasions and times, but attempts had been

made to download what it described as hacking tools as well.  Smith Dep. at 41-42;

Smithers Dep. at 38-39.  On June 7, 2005, after receiving the IT report, Ms. Sager from

Human Resources passed on this information to Ms. Little, and Ms. Little decided to

conduct further investigation in order to determine whether there was any possibility that

another employee downloaded the information under Farr's login.  Little Dep. at 59.  Ms.

Little instructed Ms. Smith (another supervisor) to review schedules, time sheets, and

assignments, and, after her review, she determined that on April 16, 2005, one of the

dates on which the IT department had determined that a number of illicit sites had been

accessed, Farr was the only respiratory therapist working.  Smith Dep. at 43-46.  It was

only after these events that Ms. Little concluded that "per hospital policy we felt like we

exhausted everything to disprove that that was not Dave.  And that we would do a

termination."[9]  Little Dep. at 62.

     We cannot, based upon the above undisputed facts, find that Farr and all of his

female co-workers are similarly situated (which is an issue we address further below),

considering that the illicit activity took place while Farr was logged onto the computer

and he was the only respiratory therapist working on one of the days that much of the

---

[9] Farr contends that the decision to terminate him was made on June 7, 2005,
immediately after Ms. Little was told about the IT report.  However, Ms. Little, who made the
final decision to terminate Farr, testified that the decision to terminate him was not made on that
date because she wanted further investigation.  Little Dep. at 58-59.  When Farr returned from
his medical leave on July 25, 2005, Ms. Little informed him of his termination.  However, in
light of his continued denials, Ms. Little decided to suspend him for five days per hospital policy
while the issue was investigated further.  Farr's termination letter was then prepared and mailed
on August 5, 2005.

illicit activity occurred.  Furthermore, even if we were to determine that the female

respiratory therapists were similarly situated to Farr, Farr has presented no evidence that

female respiratory therapists at St. Francis received *systematically* more favorable

treatment than he did as a male respiratory therapist, as required by Seventh Circuit

precedent.  Therefore, after carefully reviewing the factual record, we find that Farr is

unable to defeat summary judgment using the direct method as his circumstantial

evidence fails to point directly to a discriminatory reason for his termination.

Accordingly, if Farr's gender discrimination claim is to survive summary judgment, it

must do so via the indirect method.


### B.    Indirect Method

Under the McDonnell Douglas framework, a plaintiff must begin by establishing a

*prima facie* case of discrimination.  If one can be established, the burden shifts to the

defendant to articulate a nondiscriminatory reason for the actions it took against the

plaintiff.  If the defendant can offer a legitimate, nondiscriminatory reason for the

employment decision, the burden reverts to the plaintiff to show that there is a genuine

dispute of material fact that the proffered reason for the employment action is pretextual.

Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).  The traditional

*prima facie* case requires a showing by the plaintiff: (1) that he was part of a class of

persons protected by Title VII; (2) that he was meeting his employer's legitimate job

expectations; (3) that he suffered an adverse employment action; and (4) that similarly-

situated individuals outside his protected class were treated more favorably.  See Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007).[10]  Because St. Francis does not challenge the second or third prongs of Farr's *prima facie* case under the McDonnell Douglas framework, to wit, that he was meeting his employer's legitimate job expectations and that he was terminated, which constitutes an adverse employment action, only the fourth prong of the McDonnell Douglas analysis and the question of pretext are at issue here.

For an employee to be similarly situated to a plaintiff for purposes of McDonnell Douglas comparison, a plaintiff "must show that there is someone who is directly comparable to [him or] her in all material respects."  Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002).  While "[a] similarly situated employee need not be 'identical,' . . . the plaintiff must show that the other employee dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]."  Caskey v. Colgate-Palmolive Co., ____ F.3d ____, 2008 WL 2840833, at *4 (7th Cir. July 24, 2008) (citations omitted).  It is undisputed that Farr and the female respiratory therapists dealt with the same supervisors and were subject to the same standards.

_____

[10] The parties dispute whether this is a case of reverse discrimination in which a modified version of the McDonnell Douglas framework would be applied.  This dispute is irrelevant to our analysis, however, because we find that Farr's indirect case fails for other reasons, described below.  Therefore, for purposes of this motion, we will assume that Farr has satisfied the first prong of the McDonnell Douglas test.

However, as discussed above, in our view, Farr's conduct was not similar to the conduct of any of his female co-workers and, therefore, none of his female co-workers are directly comparable to him in all material respects.  Although it may have been the practice of the respiratory therapists to ignore St. Francis's policy requiring its employees to log off of the computer after finishing their work, it seems reasonable that when pornographic sites were found installed on the shared computer, Farr would be the logical place to begin the investigation, not because he is a man, but because the illicit sites were found installed under his username and password.  Despite Farr's argument otherwise, his supervisor, Ms. Little, did not immediately determine that he was the culprit based solely on the login information.  Following her initial conversation with Farr, in which he denied the allegations, Ms. Little sent the computer to the IT department for further investigation.  After receiving the IT report, she directed Ms. Smith to research employee schedules, timesheets, and assignments, after which Ms. Smith determined that, on one of the days on which IT had reported significant illicit computer activity, Farr was the only respiratory therapist working in the lab.  None of Farr's female co-workers ever had pornographic or hacking sites found under their login information, nor was it discovered that any of Farr's female co-workers was working alone on a day on which pornographic or hacking sites were installed on the shared computer.  Thus, they are clearly not similarly situated to Farr.

Even if Farr could prove he was similarly situated to his female co-workers, he would still have to demonstrate that St. Francis's legitimate and nondiscriminatory reason

for terminating him was pretext, or in other words, a "lie."  Perez v. Illinois, 488 F.3d 773, 776 (7th Cir. 2007).  This he cannot do.  Farr contends that the allegedly discriminatory actions taken by Ms. Smith and Ms. Little following the discovery of the pornographic links tainted the investigation taken by IT, which led to inaccurate results, namely that the investigation failed to reveal that the pornographic sites found in his "Favorites" file were not intentionally viewed, but rather were automatically installed without his knowledge as a result of his attempt to download software to fix his home computer.  Farr's proffered experts, Markus Jakobsson and Sid Stamm, described the situation as follows:

> Farr went to the search engine mama.com and searched for "windows xp pro 64 bit" referencing the windows operating system on his home computer.  This search most likely provided the link to the website http://window.xp.pro.product.key.changer.51653.crack-locater.net. . . . The crack-locator site initiated an automatic download of http://www2. Xmirror.us/download_plugin. exe, which in turn downloaded a program called "well."  That program downloaded a program called xxxtoolbar, which installed a lengthy list of links to pornographic websites on the Favorites file under Farr's password.

Pl.'s Resp. at 4-5 (citing Pl.'s Exh. C (Expert Report) at 5-7).

However, as discussed above, we cannot find that Ms. Smith's or Ms. Little's actions were discriminatory.  Furthermore, whether St. Francis's investigation could have been better conducted or whether it ultimately led to the wrong conclusion is irrelevant to the pretext determination, as the Court "do[es] not sit as a superpersonnel department that will second guess an employer's business decision."  Gordon v. United Airlines, Inc., 246 F.3d 878, 889 (7th Cir. 2001).  It is well-established in the Seventh Circuit that, "the

22

question in a discrimination case is not whether the employer's stated nondiscriminatory ground for the action of which the plaintiff is complaining is correct but whether it is the true ground of the employer's action rather than being a pretext for a decision based on some other, undisclosed ground."  Forrester v. Rauland-Borg Corp., 453 F.3d 416, 417 (7th Cir. 2006); see also Little v. Illinois Dep't of Revenue, 369 F.3d 1007, 1012 (7th Cir. 2004) ("This circuit adheres to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decisionmaker honestly believes the nondiscriminatory reason he gave for the action, pretext does not exist.") (citations omitted); Blackburn v. Potter, 2003 WL 1733549, at *8 (S.D. Ind. 2003) (Barker, J.) ("Right or wrong, the results of [the employer's] investigation are not material to the dispute here, because simply proving them wrong cannot satisfy [the plaintiff's] burden to establish pretext.").  Thus, even if St. Francis's reason for discharging Farr was "foolish, trivial, or even baseless" (and we are not saying that it was); as long as St. Francis honestly believed its reason, summary judgment for St. Francis is appropriate.  Gordon, 246 F.3d at 889 (citations omitted).

Because Farr has failed to offer evidence from which a reasonable jury could conclude that the illicit computer use traced to Farr was merely a pretextual justification for his termination, or that his supervisor, Ms. Little, did not honestly rely on the results of the IT department's investigation of the shared computer in deciding to terminate his employment, his claim cannot survive summary judgment.  Accordingly, we GRANT St. Francis's Motion for Summary Judgment.

**III.    Conclusion**

For the foregoing reasons, we <u>DENY AS MOOT</u> St. Francis's motion to exclude

Farr's expert testimony and <u>GRANT</u> summary judgment in St. Francis's favor.  Final

judgment will be entered accordingly.

IT IS SO ORDERED.


Date: _____08/01/2008_____


                                                _Sarah Evans Barker_____
                                                SARAH EVANS BARKER, JUDGE
                                                United States District Court
                                                Southern District of Indiana

Copies to:

Jeffrey Stuart Ankrom
BERRY & DOMER
ankrom@copyrighttimes.com

Thomas Allen Berry
BERRY & DOOMER
tom@tomberry.com

Robert C. Price
PRICE & RUNNELLS
robertcprice@att.net

Mary M. Runnells
PRICE & RUNNELLS
mrun4@att.net

John Patrick Ryan
HALL RENDER KILLIAN HEATH & LYMAN
jpryan@hallrender.com

Craig M. Williams
HALL RENDER KILLIAN HEATH & LYMAN
cwilliams@HallRender.com